**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JESSIE HOPSON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 5993** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Jessie Hopson seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants the Commissioner's motion, denies Plaintiff's motion, and affirms the decision to deny disability benefits.

## <u>BACKGROUND</u>

Plaintiff, a 53 year-old high school graduate with one year of college education, alleges she has been disabled since December 22, 2010, due to Carpal-Tunnel Syndrome, diverticulitis, skin lupus, and arthritis. (R. 109-11). After working full time for about 14 years, including 10 years as a line worker/assembler, she was laid off in December 2010 due to lack of work. (R. 74-76, 80-81, 89).

## A. Medical and Procedural History Prior to the ALJ's Decision

### 1. Treatments Prior to Plaintiff's Application for Benefits

In Plaintiff's earliest medical records from June 2010, Plaintiff complained of dull, moderate body and back pain while being treated for a throat infection, and was told to take Tylenol or Advil for her pain. (R. 319-23). A few months later, on August 26, 2010, Plaintiff was hospitalized for abdominal issues, which were eventually diagnosed as acute diverticulitis. (R. 299-300). While hospitalized, Plaintiff complained of joint pain, and the attending physician, Dr. Chaden Sbai, assessed her with "the possibility of lupus." (R. 293). Dr. Sbai prescribed Norco for Plaintiff's pain and ordered testing, but the results are not in the record. (*Id.*).

### 2. Plaintiff's Application for Benefits and Subsequent Medical History

On December 26, 2010, Plaintiff, who was then 49 years old, applied for disability benefits. (R. 109-11). A few days later, on January 4, 2011, Plaintiff sought treatment from an orthopedic surgeon, Dr. Robert Markus, for what she described as long-standing pain in her hands and knees. (R. 254). Dr. Markus wrote that Plaintiff had documentation showing bilateral knee arthritis, including a June 2010 MRI of her left knee (which is not in the record), and that she reported having surgery in the right hand to treat Carpal-Tunnel Syndrome in 2009. (*Id.*). The surgeon also examined Plaintiff and found no abnormal results, except for some signs of finger locking in her right ring finger. (*Id.*). He also noted that Plaintiff's height was 5'4" and weight was 172 pounds, giving her a body mass index ("BMI") of 29.5. (*Id.*).

Dr. Markus administered cortisone injections in Plaintiff's finger and knees, prescribed wrist splints, Vitamin B6 and Meloxicam for her arthritis-related pain, and

recommended an EMG. (*Id.*). The EMG is not in the record, but Dr. Markus' January 18, 2011 notes state that the EMG showed "very mild bilateral median neuropathy." (R. 253). Dr. Markus recommended Plaintiff follow up as needed, but she did not visit him again. (*Id.*).

On March 9, 2011, Plaintiff submitted a function report to the Social Security Administration ("SSA") in support of her disability claim. (R. 183-192). In that report, Plaintiff complained of pain "all day every day," particularly in the stomach, knees and hands. (R. 183-84). She reported that she can cook, including quick meals using the oven or microwave, and that she does laundry, but cannot stand for cooking or doing laundry for more than 10 or 15 minutes. (R. 185).

Plaintiff also reported going outside alone once a week and going to church regularly. (R. 186-87). However, her daughter does her shopping for her, because she cannot walk or stand for a long time. (R. 184, 186). She explained that she could walk for about a block, but then needed to stop and rest for about 15 or 20 minutes. (R. 188). In the section of the report asking Plaintiff to check a box to indicate if she used crutches, a cane, a walker, or a wheel chair, she checked no boxes. (R. 189). She did check boxes indicating she uses a brace and glasses, and wrote that those devices had been prescribed by doctors. (*Id.*).

On May 4, 2011, Plaintiff underwent a right knee x-ray (which is not in the record) and had a BDDS consultative examination by Dr. Liana G. Palacci, an internist, for the purposes of evaluating her disability claim. (R. 257-62). Plaintiff told Dr. Palacci that she had, among other issues, joint pains in the feet and knees, with creaking and swelling in the knees. (R. 258-59). She also told Dr. Palacci that she had been using a non-

prescribed walker for balance and pain relief, and that she needed it to ambulate less than 50 feet. (*Id.*). She used the device during the examination. (*Id.*). Plaintiff also reported wearing her prescribed wrist splints at night, and was still taking Meloxicam. (*Id.*).

Dr. Palacci reviewed Plaintiff's medical records from Dr. Markus and her right knee x-ray, and examined her. (R. 258; 260-61). Dr. Palacci measured Plaintiff's height as 5'5" and weight as 185 pounds at the time, making her obese. (R. 259). Dr. Palacci also found Plaintiff exhibited signs of lupus in the scalp; difficulty with heel and toe standing and squats; an antalgic gait; a reduced range of motion in the knees (120/150 flexion in the left and 70/150 flexion in the right); 4+/5 strength in the right leg; and 5/5 strength in the left leg. (R. 260-61). The doctor also wrote that Plaintiff's right knee x-ray showed mild osteoarthritis. (*Id.*).

On May 19, 2011, Dr. Francis Vincent, a BDDS consulting physician, prepared a residual functional capacity assessment of Plaintiff, and determined that she is capable of light work, with limited use of the upper extremities. (R. 101-04). Due to Plaintiff's knee issues, Dr. Vincent limited Plaintiff to the occasional climbing of ramps, stairs, ladders, ropes and scaffolds, and occasional crouching, kneeling and crawling. (*Id.*). To account for Plaintiff's lupus, Dr. Vincent recommended she limit her exposure to concentrated heat and sun. (R. 104). The doctor's analysis of the evidence includes a discussion of Dr. Markus's notes and Dr. Palacci's notes, as well as other evidence. (R. 101). Dr. Vincent specifically noted that Plaintiff had a BMI of 30.8 at the time of Dr. Palacci's examination. (*Id.*).

On June 14, 2011, Plaintiff underwent foot, knee and hip x-rays, apparently after complaining of pain at a hospital (the referral is not in the record, and the x-rays list the referring doctor as "unassigned MD"). (R. 335-37). The foot x-rays showed mild to moderate bunions, and the hip x-ray showed mild degenerative changes in the hip and lower back joints. (R. 335-36). The knee x-rays showed moderate to marked narrowing of the patellofemoral joint spaces, marked narrowing of the medial and lateral knee joint compartments, and osteoarthritic spurs.[1] (R. 337). A few days after these x-rays were taken, on June 17, 2010, the SSA denied Plaintiff's disability claim. (R. 107).

### 3. Plaintiff's Post-Denial Medical History and Claim Reconsideration

Plaintiff visited an emergency room on June 17, 2011 at the Oak Forest Hospital due to, among other issues, severe aching pain in the knees and heels. (R. 280-81). She reported to the emergency room physician that she was still taking her arthritis medication. (*Id.*). She was referred for ankle and foot x-rays, which she underwent on June 20, 2011. (R. 266-69). Those x-rays showed a "slightly decreased" plantar arch in the left foot and degenerative changes in the mid-foot and hind-foot in both feet. (*Id.*). The radiologist described Plaintiff's degenerative changes in the right foot as "early." (*Id.*).

On July 19, 2011, Plaintiff filed for reconsideration of the denial of her disability claim. (R. 108). A few weeks later, on August 31, 2011, BDDS consulting physician Dr. James Hinchen prepared a residual functional capacity assessment pursuant to the

---

[1]     The patellofemoral joint is where the kneecap (patella) and the femur meet. http://www.medicinenet.com/script/main/art.asp?articlekey=8848 (all websites in this opinion were last visited December 4, 2014). The medial and lateral compartments are the inner and outer compartments, respectively, of the main knee joint, where the thigh bone (femur) meets the shin bone (tibia). *Id.*

reconsideration of Plaintiff's claim. (R. 287-89). Dr. Hinchen affirmed Dr. Vincent's May 19, 2011 findings. (R. 287-89). On September 1, 2011, the SSA again denied Plaintiff's disability claim. (R. 108).

### 4.     Plaintiff's Request for a Hearing and Subsequent Medical History

On September 27, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") to review her disability claim. (R. 123). A few days later, on October 11, 2011, Plaintiff had wrist x-rays done, which produced "normal" results. (R. 338).

On November 16, 2011, Dr. Mayuri Dasari, a geriatric medicine specialist, filled-out a physical residual functional capacity questionnaire form for Plaintiff. (R. 339-341). Dr. Dasari wrote that she treated Plaintiff for degenerative joint disease on three occasions since August 2011, but there are no notes concerning such treatments in the record. (R. 339). Dr. Dasari found that Plaintiff suffers from chronic pain and a limited range of motion in the joints, as well as depression. (*Id.*). She explained that Plaintiff took Tylenol and ibuprofen for pain, as well as trazodone for sleep. (*Id.*).

The doctor indicated on the form that Plaintiff cannot walk even one block without severe pain, can only sit for up to 30 minutes, stand for up to 15 minutes, and would require constant, unscheduled breaks to change positions at work. (R. 339-40). She also checked boxes indicating that Plaintiff cannot lift even 10 pounds, and that she would likely be absent from work "[m]ore than four days per month." (R. 340-41). There are no further medical notes or opinions proceeding the hearing before the ALJ.

### B.     Plaintiff's Testimony

On May 25, 2012, ALJ Jose Anglada held a hearing in this matter. (R. 46). Plaintiff (who was represented by counsel) testified at the hearing, and stated that she

lives in a room in her daughter's house. (R. 51-52). She worked full time for about 14 years until December 2010, and she spent the last 10 of those years working as a line worker/assembler for a company that recycled windows. (R. 74-76, 89). She said she was laid off from that job due to her employer's lack of work for her. (R. 80-81).

Plaintiff testified that since she stopped working, she spends most of her time in bed, up to 21 hours a day, and eats in bed most of the time. (R. 52-54, 75). She further testified that she is about 5'6", that her weight at the time of the hearing was 178 pounds, and that she had lost about 20 pounds over the previous four months due to a change in diet. (R. 57). She said she treats her joint pain with over the counter ibuprofen. (R. 67-68).

Plaintiff stated that due to her conditions, she cannot walk even one block, and can only lift "maybe 10 pounds," stand for up to 10 minutes and sit for up to 30 minutes. (R. 55, 72-74). Plaintiff also testified that Dr. Dasari referred her to see certain specialists, including a rheumatologist. (R. 66). She expected to visit the rheumatologist in July 2014, specifically to treat her osteoarthritis. (*Id.*).

**C.    Administrative Law Judge's Decision**

In his June 29, 2012 decision, the ALJ found that Plaintiff has osteoarthritis and diverticulitis, which are severe impairments, and hypertension, lupus and depression, which are non-severe impairments. (R. 33-34). Although the ALJ discussed Plaintiff's history of Carpal-Tunnel Syndrome, he did not specifically indicate whether it was a severe or non-severe impairment. (R. 37).

After considering the record, the ALJ determined that Plaintiff has the residual functional capacity to perform a limited range of light work. (R. 35). However, the

vocational expert who testified at the hearing stated that Plaintiff's past work required the ability to perform medium work. (R. 40). Nevertheless, the ALJ determined that Plaintiff is not disabled because, although she cannot perform any of her past work, she can perform other jobs that exist in significant numbers in the national economy. (R. 40-41). Representative samples of these jobs include:  linen grader (1,000 jobs in the Chicago metro area, 60,000 jobs in the national economy); collator operator (1,000 jobs in the Chicago metro area, 50,000 jobs in the national economy); and folding machine operator (2,000 jobs in the Chicago metro area, 50,000 jobs in the national economy). (*Id.*).

In making this decision, the ALJ gave great weight to the assessments of the state agency medical consultants, which he found were supported by the record, including the objective medical evidence. (R. 39). The supportive medical evidence included Dr. Palacci's consultative examination results, which showed Plaintiff "maintained strength in her legs," and the "mostly mild findings" of Plaintiff's diagnostic testing results. (R. 34-35). The ALJ rejected Dr. Dasari's November 16, 2011 opinion as unsupported. (R. 38-39).

Among his other findings, the ALJ discussed that the record showed Plaintiff made relatively infrequent trips to the doctor, and Dr. Dasari noted that Plaintiff only treated her pain with over-the-counter Tylenol and ibuprofen at the time of her opinion. (R. 35, 36, 38). The ALJ found that these treatments were inconsistent with total disability. (R. 35). The ALJ's determination that Plaintiff is not disabled covers the period from December 22, 2010 to June 29, 2012. (R. 31).

**D.     Medical and Procedural History Subsequent to the ALJ's Decision**

Plaintiff requested review of the ALJ's decision from the SSA's Appeals Council on September 11, 2012. (R. 23-24). In the meantime, Plaintiff continued to receive treatments and was prescribed various medications for her conditions. (Doc. 17-1, at 21-57). These treatments included Plaintiff's initial examination by a rheumatologist, Dr. Winston Sequeira, on July 11, 2012. (*Id.* at 26-29). Plaintiff reported to Dr. Sequeira a history of osteoarthritis in the knees, hips and hands that had worsened over the past year. (*Id.*). Dr. Sequeira's notes reflect that Plaintiff had a confirmed diagnosis of degenerative joint disease and osteoarthritis, and he wrote that her osteoarthritis was moderate and appeared to be worsening. (*Id.*). The rheumatologist also examined Plaintiff and found she had a decreased range of motion in the knees, minimal creaking, and pain, but found that her examination was "essentially normal." (*Id.*) He recommended Tylenol #3 for her pain. (*Id.*). He also referred Plaintiff for x-rays of the knees, hips and spine. (*Id.*).

Plaintiff had her x-rays done the same day she saw Dr. Sequeira. (*Id.* at 21-25). Her hip x-ray showed mild degenerative changes in the bilateral hip joints; her knee x-ray showed mild degenerative changes in her medial knee compartments, and moderate degenerative changes in her lateral and patellofemoral compartments; her lumbosacral spine x-ray showed mild to moderate degenerative disc disease at L5-S1; and her thoracic spine x-ray showed moderate degenerative changes. (*Id.*).

A few weeks later, on August 8, 2012, Plaintiff followed up with Dr. Sequeira, who examined her with his colleague, Dr. David Giangreco. (Doc. 17-1, at 32-35). Plaintiff told the doctors that she stopped taking Tylenol #3 due to stomach issues, but

she was taking tramadol, which was not helping her pain. (*Id.*). She was also taking duloxetine for depression, which she said helped "a little bit" with her pain, and she was wearing the wrist splints prescribed by Dr. Markus. (*Id.*). Upon examination, Plaintiff displayed tenderness in 12 fibromyalgia points and difficulty moving due to pain, particularly in her right knee, but normal strength in the left leg and arms, and normal reflexes in both legs. (*Id.*). The doctors noted a working diagnosis of fibromyalgia, and wrote that Plaintiff's pain was "likely myofascial," but they could not find a cause for her pain since her "work up has been essentially negative." [2] (*Id.*). The doctors recommended Plaintiff increase her duloxetine, continue tramadol and Tylenol #3, and follow up with Dr. Dasari.

On December 21, 2012, Plaintiff followed up with Dr. Dasari. (Doc. 17-1, at 48-52). She was tearful when discussing her financial distress and worries. (*Id.*). She had also lost weight, weighing 163 pounds, which she said happened without trying, although she did experience some recent appetite loss. (*Id.*). Dr. Dasari noted improvement in Plaintiff's lupus lesions on her scalp and that she had normal strength, but also some tenderness and guarding. (*Id.*). Dr. Dasari also noted that Plaintiff had been taking Citalopram for depression, and recommended she continue taking it. (*Id.*). She also recommended Plaintiff start the anti-depressant amitriptyline, take diclofenac for her arthritis, and follow-up after her upcoming appointment with a pain clinic. (*Id.*). Plaintiff visited the pain clinic on January 22, 2013, where she reported to a nurse that her pain completely interferes with most activities, and she was treating it with tramadol and diclofenac with no relief. (Doc. 17-1, at 54-57).

---

[2]     "Myofascial" refers to "[t]he fibrous tissue that encloses and separates layers of muscles." http://medical-dictionary.thefreedictionary.com/myofascial.

**E.    Appeals Council's Determination and the Current Procedural Posture**

On June 21, 2013, Plaintiff sent records concerning her treatments from July 2012 through January 2013 (along with other medical records which pre-dated the hearing before the ALJ) to the Appeals Council to consider when evaluating her request for review of the ALJ's June 29, 2012 decision. (R. 242-45). She also provided a letter outlining what she thinks are the significant portions of those records. (*Id.*).

A couple of months later, on August 2, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's June 29, 2012 decision the final decision of the Commissioner. (R. 1-3). The Appeals Council's letter denying review stated that it found Plaintiff's July 2012 through January 2013 records were "new," but contained information about "a later time" than that covered by the ALJ's decision. (R. 2). As a result, it found that those records did not provide a basis for changing the decision. (*Id.*). The Appeals Council did not make any of the treatment records Plaintiff submitted a part of the administrative record in this case.

Plaintiff now seeks judicial review. In support of her motion, Plaintiff argues that the Appeals Council erred by failing to properly consider the July 2012 through January 2013 treatment records she submitted. She further argues that the ALJ erred:  (1) by failing to find that her knee impairments met or equaled Listing 1.02(A); and (2) by failing to analyze the impact of her obesity, and failing to properly consider certain knee x-rays, when determining her residual functional capacity. As explained below, the

Court finds that neither the Appeals Council's determination, nor the ALJ's decision, requires reversal or remand.[3]

## DISCUSSION

### A.    Standard of Review

Judicial review of the ALJ's decision, which constitutes the Commissioner's final decision, is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). That decision will be upheld "so long as it is supported by 'substantial evidence' and the ALJ built an 'accurate and logical bridge' between the evidence and her conclusion. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (quoting *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). Although the Court will not reweigh the evidence or substitute its judgment for that of the ALJ, a decision that "lacks adequate discussion of the issues will be remanded." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *see also id.* (the ALJ's articulated reasoning must be sufficient to allow the reviewing court to assess the validity of the agency's findings and afford a claimant meaningful judicial review).

### B.    Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that she suffers from a "disability" as defined by the Act and regulations. *Infusino v. Colvin,* 12 CV 3852, 2014 WL 266205, at *7 (N.D. Ill. Jan. 23, 2014); *Gravina v. Astrue*, 10-CV-6753, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012). A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically

---

[3]    In her opening brief, Plaintiff argued that her case must also be remanded for consideration of the records she submitted to the Appeals Council that pre-dated the ALJ's decision. (Doc. 17, at 6-9). Plaintiff has withdrawn that argument. (Doc. 26, at 7).

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A); *see also Infusino,* 2014 WL 266205, at *7; *Gravina*, 2012 WL 3006470, at *3.

In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Simila*, 573 F.3d at 512-13 (citing *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)).

**C.    Analysis**

**1.    Evidence Submitted to the Appeals Council**

Plaintiff first argues that the Appeals Council erred in considering the July 2012 through January 2013 medical records she submitted to it. (Doc. 17, at 9-10; Doc. 26, at 6-7). Under the regulations, if a claimant submits "new and material" evidence to the Appeals Council, it shall consider that evidence along with the record that was before the ALJ in determining whether to review the case. 20 C.F.R. § 404.970(b). Here, the Appeals Council determined the records were new, but concerned Plaintiff's condition at "a later time" than the period covered by the ALJ's decision, and thus did not provide a basis for changing that decision. (R. 1-2). Plaintiff contends that the Appeals Council's reasoning is flawed and in fact the records were both new and material.

To be material, the new evidence a claimant submits must relate to the claimant's condition "during the relevant time period encompassed by the disability application" that was reviewed by the ALJ. *Schmidt v. Barnhart,* 395 F.3d 737, 742 (7th Cir. 2005) (quoting *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990)). The claimant must also "show that there is a reasonable possibility that the ALJ would have reached a different conclusion had the evidence been considered." *Willis v. Apfel*, 116 F. Supp. 2d 971, 976 (N.D. Ill. 2000) (citing *Sears v. Bowen*, 840 F.2d 394, 399–400 (7th Cir.1988)). In this case, the post-decision records Plaintiff submitted do not meet either of those standards.

Plaintiff argues that the records are material because they establish a diagnosis of fibromyalgia, which explains the discrepancy between her complaints of severe pain and what the ALJ found were "mild" findings of impairments in the objective medical evidence he considered. (Doc. 17, at 9-10). But the post-decision records do not indicate that Plaintiff's pain prior to the ALJ's June 29, 2012 decision was caused by fibromyalgia. Instead, the rheumatologists merely indicated a working diagnosis of fibromyalgia and the possibility that Plaintiff's pain is myofascial, but those findings were not further developed. The records also contain no information about the severity of Plaintiff's fibromyalgia, whether it was pre-existing in nature and to what extent, or any other information that would shed light on the nature of her condition prior to the ALJ's decision.

Furthermore, the same notes that discuss the working fibromyalgia diagnosis also explain that the rheumatologists could not determine a cause for her pain because their "work up has been essentially negative." (Doc. 17-1, at 34). Those doctors also

wrote that Plaintiff had mostly normal examination results, except for some right knee pain and range of motion limitations, which does not provide any more information than the other examination results that the ALJ already reviewed. (*Id.*). Thus, these records do not contain information which could undermine the ALJ's conclusions regarding the medical evidence in the record.

Plaintiff also argues that the post-decision records show she visited doctors and was prescribed medications for pain and depression, which rebuts the ALJ's findings that she made relatively infrequent trips to the doctor and relied on over the counter medications for her pain. (Doc. 17, at 10). But the fact that she went to visit doctors after the ALJ's decision does not invalidate his finding that she rarely visited doctors before the date of his decision. Also, although the post-decision records discuss that Plaintiff took certain prescription medications after the ALJ's decision, they do not indicate whether she was regularly taking those medications before that decision date. Nor do the post-decision records contradict Dr. Dasari's November 16, 2011 opinion, cited by the ALJ, which discussed that Plaintiff only treated her pain with over the counter medications at that time. (R. 36, 38).

In sum, the Appeals Council did not err in determining that Plaintiff's post-decision records from June 2012 through January 2013 were not material, and the decision does not require reversal to address those records.

### 2. Listing 1.02

Plaintiff argues that the ALJ erred at Step Three by not finding that her knee impairments met or medically equaled Listing 1.02(A). (Doc. 17, at 12-14; Doc. 26, at 4-6). The Listings identify and describe impairments that the SSA considers severe

enough to prevent an individual from doing any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525(a). The claimant bears "the burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006)). The ALJ's finding that Plaintiff did not meet her burden here is supported by substantial evidence.

Listing 1.02(A) relates to persons with a major dysfunction of a major peripheral weight-bearing joint (i.e., hip, knee or ankle) that causes an inability to ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P, Appendix I, § 1.02(A). The listings define a major dysfunction of a joint as a "gross anatomical deformity" with "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)." *Id.* And the listings define the inability to ambulate effectively as "an extreme limitation of the ability to walk," such that the person cannot ambulate independently without the use of a hand-held assistance device. *Id.* § 1.00(B)(2)(b)(1). Examples of ineffective ambulation include the inability to walk without a walker, two crutches, or two canes, or an inability to walk a block at a reasonable pace on rough or uneven surfaces. *Id.* § 1.00(B)(2)(b)(2).

The ALJ found that the evidence does not show that Plaintiff's impairments satisfied the above criteria. The ALJ noted that Plaintiff had been diagnosed with arthritis of the lower extremities, particularly the knees. (R. 34). The ALJ also noted that Plaintiff used an ambulatory aid during her May 4, 2011 consultative examination by Dr. Palacci. (*Id.*). However, the record contained no prescription from a doctor for any

ambulatory aid, and in Plaintiff's March 9, 2011 function report, she did not indicate the need for any ambulatory aid. (*Id.*). She also did not testify at the hearing that she needed an ambulatory aid. (*Id.*). Moreover, the ALJ found that Dr. Palacci's physical examination showed Plaintiff "maintained strength in her legs." (*Id.*). In summary, the ALJ wrote that "[n]o treating or examining physician has identified findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment." (R. 34). These findings are all supported by the record.

Plaintiff argues that her reduced range of motion in the knees at the May 4, 2011 consultative examination, and her June 14, 2011 x-rays indicating various moderate to marked degenerative changes in her knees, show that she suffered from a knee impairment that is severe enough to meet the Listings criteria. (Doc. 17, at 13; Doc. 26, at 5-6). She further argues that the ALJ failed to explain why such evidence does not show she meets Listing 1.02(A). (*Id.*). On the contrary, the ALJ specifically explained that he considered the consultative examination results and Plaintiff's x-rays along with the other medical evidence in the file, and found the evidence showed she suffered from osteoarthritis, but not of the severity that Plaintiff asserts. (R. 34-35; 37). Plaintiff also cites no medical opinion in support of her assertion that the ALJ's analysis of the medical evidence was flawed. In contrast, the ALJ's conclusions are supported by the opinions of the state agency consultative physicians—opinions that Plaintiff does not challenge.

Plaintiff also points to her complaints of knee pain and the allegations of severe limitations in walking and standing she made to her doctors, in her function report, and

in her hearing testimony as supportive of her argument. These subjective allegations alone cannot meet her burden to produce medical evidence showing her knee impairment meets a listing. *Knox*, 327 F. App'x at 655; *see also Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (quoting 20 C.F. R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."). On this record, the ALJ reasonably concluded that Plaintiff's knee impairment did not meet or equal Listing 1.02(A).

### 3. RFC Determination

Plaintiff argues that the ALJ's residual functional capacity determination was flawed in two respects:  he failed to expressly analyze her obesity, and he did not properly consider her June 14, 2011 knee x-rays. (Doc. 17, at 10-12, 14-15; Doc. 26, at 2-3). A claimant's residual functional capacity ("RFC") is the most she can do despite her limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a). When determining the RFC, the ALJ must consider "all of the relevant evidence in the record," including evidence of limitations that are not severe. *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (quoting *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)).

### a. Obesity

Plaintiff argues that the ALJ's failure to expressly discuss his findings regarding the impact of her obesity on the RFC determination in his Step Four analysis requires her case be remanded. (Doc. 17, at 10-12; Doc. 26, at 3-4). The Commissioner argues that any error here is harmless, because the ALJ expressly acknowledged Plaintiff's obesity in the decision and relied on physicians who were aware of her obesity, and

Plaintiff fails to show that her obesity exacerbated her limitations beyond what was accounted for in the RFC determination. This Court agrees with the Commissioner.

Although the ALJ did not explain his consideration of Plaintiff's obesity on her limitations, he noted Dr. Palacci's obesity diagnosis, showing he was aware of that condition. (R. 37). The ALJ also asked Plaintiff about her weight at the hearing, where she testified that she had been losing weight and weighed 178 pounds at that time, which is less than she weighed at Dr. Palacci's examination. (R. 57). The ALJ also gave great weight to Dr. Vincent's assessment of Plaintiff's functionality, and that doctor noted that Plaintiff's BMI at Dr. Palacci's examination was 30.8 in his analysis of the evidence. (R. 39). Furthermore, the ALJ gave some weight to the opinion of Plaintiff's treating orthopedic surgeon, Dr. Markus, who noted Plaintiff's BMI of 29.5 when he treated her on January 4, 2011, and who did not indicate in his notes that Plaintiff's weight aggravated her conditions or resulted in any specific impairments. (*Id.*).

Plaintiff also fails to point to any evidence suggesting that her obesity caused her any specific limitations or aggravated her physical impairments to an extent that the ALJ did not account for in the RFC determination. She argues that her obesity aggravated her knee impairment, but the only evidence she points to in support is Dr. Dasari's November 16, 2011 questionnaire responses. Dr. Dasari, however, does not discuss Plaintiff's obesity in the questionnaire, and there are no treatment notes in the record from that doctor. Thus, there is no evidence indicating that Dr. Dasari was aware of or attributed any of Plaintiff's limitations as described in the questionnaire to her weight. When an ALJ "predicates his decision upon the opinions of physicians who" were aware of the claimant's obesity, and the claimant fails to show "how his obesity further

impaired his ability to work," any error by the ALJ in failing to discuss his consideration of the claimant's obesity is harmless. *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). Based on the foregoing, this case does not require remand for the ALJ to further analyze Plaintiff's obesity.

### b. Knee X-rays

Finally, Plaintiff argues that the ALJ erred when summarizing the findings in her diagnostic testing as "mostly mild findings." (Doc. 17, at 14-15; Doc. 26, at 2). She notes that the radiologist who performed her June 14, 2011 knee x-rays found that the x-rays displayed moderate to marked degenerative changes. (*Id.*) She argues that the ALJ's language implies he missed, ignored, or misinterpreted those findings, or disagreed with the radiologist. (*Id.*). She argues the decision must be remanded to ensure the ALJ properly considers those x-rays. (*Id.*).

Plaintiff's argument has no merit. The ALJ's citations to the evidence makes clear that when he referred to Plaintiff's testing results as showing "mostly mild findings," he referred collectively to her January 18, 2011 EMG testing results, her June 14, 2011 x-rays of the feet, hips, and knees, and her October 11, 2011 wrist x-rays. (R. 35). And the ALJ's description of that evidence is supported by the record, since the EMG results and x-rays all showed mild or normal findings, except for a finding of mild to moderate bunions in her feet, and the moderate to marked findings in her knees.

Later in the decision, the ALJ discussed Plaintiff's June 14, 2011 x-ray results along with the June 20, 2011 x-ray results, showing his further consideration of the findings. (R. 37). He specifically compared the findings from the knee x-rays to the hip

x-rays, stating that the knee x-rays showed Plaintiff had osteoarthritis, whereas the hip x-rays showed "only mild degenerative changes." (*Id.*). This discussion shows not only that the ALJ did not miss or ignore Plaintiff's June 14, 2011 knee x-rays, but that the ALJ acknowledged that the knee x-rays had findings that were greater than mild.

The ALJ did not explicitly state in his decision that the findings in Plaintiff's June 14, 2011 x-rays were marked to moderate, but his RFC determination "need not contain a complete written evaluation of every piece of evidence." *Murphy*, 759 F.3d at 817-18 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)). Instead, the ALJ must show that he considered the relevant evidence, did not "dismiss a line of evidence contrary to the ruling," and his conclusion must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 815, 817. That standard is met here.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 21) is granted and Plaintiff's Motion for Summary Judgment (Doc. 16) is denied. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: December 5, 2014

*Sheila Finnegan*

SHEILA FINNEGAN
United States Magistrate Judge